[No. 200,915-8.   En Banc.]
Argued February 28, 2012.   Decided August 23, 2012.

*In the Matter of the Disciplinary Proceeding Against*
BAKARY FANSU CONTEH, *an Attorney at Law.*

*Brett A. Purtzer* (of *Hester Law Group*), for the attorney.
*Scott G. Busby*, for the Bar Association.

¶1 STEPHENS, J. — In the summer of 2002, attorney Bakary Fansu Conteh traveled from The Gambia to the United States on a G-2 visa. He remained after his visa expired, obtained work as a nursing assistant, and ultimately gained admission to the Washington State bar in 2004. Following his admission, he began practicing immigration law as a sole proprietor, even though he did not have permission to work in the United States outside his G-2 status. In 2008, this state of affairs led to an ethical investigation by the Washington State Bar Association, which charged Conteh with three counts of misconduct relating to misrepresentations on his bar application and immigration forms, as well as the unauthorized practice of law. The hearing officer found a violation relating to misrepresentations on Conteh's asylum application and recommended a 60-day suspension. The disciplinary board adopted the hearing officer's findings but found these findings established an additional violation related to the unauthorized practice of law. Because of this, the board recommended a much harsher sanction—an 18-month suspension.

¶2 We conclude that the board erred in finding an additional violation previously rejected by the hearing officer. However, we find the hearing officer's recommended sanction to be too lenient. Accordingly, we impose a suspension of six months.

## FACTS AND PROCEDURAL HISTORY

¶3 Conteh was born in The Gambia and educated in Africa. After earning his law degree, he gained admission to the bar in The Gambia. In 1999, he was designated a state counsel and was later promoted to senior state counsel for The Gambia.

¶4 In 2002, Conteh traveled to the United States to represent The Gambia at the 10th session of the Preparatory Commission for the International Criminal Court

(PCICC), under the auspices of the United Nations. Conteh obtained a G-2 visa, which enables nonimmigrants representing recognized foreign governments to attend meetings of designated international organizations. *See* 8 U.S.C. § 1101(a)(15)(G)(ii). He arrived in New York City on June 30, 2002. Conteh's I-94 form indicated his departure date was "DS," which means "duration of status." A "duration of status" indication means that the alien can remain in the United States so long as he or she both remains in good status and is allowed to stay by the secretary of state. A visa holder is considered to be in good status so long as he continues in the particular purpose for which the visa was issued.

¶5 Conteh's G-2 status depended on his functioning as a representative of The Gambia at the PCICC, which lasted approximately two weeks. While Conteh testified he had hoped to study issues relevant to the implementation of the International Criminal Court at DePaul University following the conference, those plans never panned out. He remained in the United States after the conference ended. Eventually, his visa and return ticket to The Gambia expired.

¶6 Later that summer, Conteh moved to Washington State. He found work as a nursing assistant from 2002 into 2005. Because this employment was not related to his work at the PCICC, it was outside the scope of his G-2 status. *See* 8 C.F.R. § 214.2(g)(10) ("An alien who is classified [G-2] who is a principal alien and who engages in employment outside the scope of his/her official position may be considered in violation of . . . the Act.").

¶7 Based on his legal experience in The Gambia, a common law country, Conteh was eligible to sit for the bar exam. APR 3(b)(iii). He applied to take the July 2003 exam. The application directed him to list "all employment, or employment status, for the past five years" and counseled that discipline could result for failure to disclose a material fact in connection with the application. Ex. 3, at 3. Despite

this warning, Conteh listed only his employment with The Gambian government, which he described as ending on July 31, 2002. He further signed a statement, under penalty of perjury, certifying that the statements in his application were true and correct.

¶8 After failing the bar exam, Conteh renewed his application, declaring once more under penalty of perjury that the information in his previous application was true and correct. He passed the February 2004 bar exam, took his oath of attorney, and was admitted to the bar. In July 2004, Conteh began practicing immigration law as a sole proprietor.

¶9 Around the time Conteh began practicing, he sought lawful permanent residence status by filing an "Immigrant Petition for Alien Worker" (I-140 form). In supporting documentation of his qualifications, Conteh described his work for The Gambia as ending in July 2002. His petition was denied.

¶10 On March 25, 2008, Conteh filed an independent "Application for Asylum and for Withholding of Removal." In general, an asylum application must be filed within one year of entering the United States unless an extraordinary circumstance applies—which may include remaining in lawful G-2 status. 8 U.S.C. § 1158(a)(2)(D); *see* 8 C.F.R. § 1208.4(a)(5)(iv) (noting that extraordinary circumstances may include maintaining lawful nonimmigrant status until a reasonable period before filing an application for asylum).

¶11 To demonstrate that he remained in G-2 status within one year of applying for asylum, Conteh presented a document purporting to be a letter from a Gambian official dismissing him from government service effective December 17, 2007. Conteh claims a friend in The Gambia obtained the letter from his personnel file, which his cousin then mailed to Conteh. Based on this letter, the immigra-

tion court determined that Conteh's G-2 status ended on December 31, 2007.[1]

¶12 Conteh's asylum application asked him to list his employment for the previous five years. Once again, Conteh did not disclose his employment as a nursing assistant. He did list his employment for The Gambia, which he represented as having ended in December 2007. Under penalty of perjury, he certified that all information in the application was true and correct.

¶13 On April 14, 2008, Rachel McCarthy, bar counsel for the United States Citizenship and Immigration Services (USCIS), filed a grievance against Conteh with the Washington State Bar Association's Office of Disciplinary Counsel. Her grievance alleged that Conteh did not have permission to be employed in the United States and it appeared he had been "engaged in employment as an attorney without employment authorization from USCIS as required by law." Ex. 24.

¶14 Following its investigation, the bar association filed a formal complaint against Conteh, charging him with three counts of misconduct. Count 1 charged Conteh with violating RPC 8.4(c) and former RPC 8.1(a) (2002) by misrepresenting his employment history on his bar exam applications. Count 2 alleged he violated RPC 8.4(i) and 8.4(k) by practicing law contrary to the immigration laws of the United States. Finally, count 3 charged Conteh with violating RPC 3.3(a)(1), 8.4(c), and 8.4(d) by misrepresenting his employment history on his asylum application.

¶15 Conteh was granted asylum in May 2010. While his status may be subject to some finalization, his private legal practice has been lawful since that time.

¶16 A hearing on Conteh's disciplinary charges was held on August 2 and 3, 2010, before Hearing Officer Malcolm L.

---

[1] Conteh had been placed in removal proceedings and apparently produced this letter in response to a notice to appear before he filed his independent application for asylum. It is uncertain why December 31, 2007 was listed as the end date instead of December 17, 2007—the date Conteh was allegedly terminated.

Edwards. Witnesses included Jean McElroy, the director of regulatory services of the Washington State Bar Association; Dana Laverty, an associate counsel with the Office of Chief Counsel for USCIS; and Conteh.

¶17 The hearing officer determined the bar association failed to prove a violation on count 1 because Conteh's omission of employment as a nursing assistant was not material to his bar application and did not involve fraud or deceit. As to count 2, the hearing officer concluded that while Conteh had worked outside the scope of his G-2 status, this did not reflect disregard of the rule of law in violation of RPC 8.4(i). He further concluded Conteh did not violate his oath of attorney under RPC 8.4(k) by working in violation of the immigration laws because the oath is prospective.

¶18 On count 3 relating to the asylum application, however, Hearing Officer Edwards determined that Conteh's representation of his employment under The Gambian government through December 2007 was knowingly false and thus violated RPC 3.3(a)(1), which provides that "[a] lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal." The hearing officer further found that Conteh had a purpose to deceive and therefore violated RPC 8.4(c), which provides that it is professional misconduct to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Finally, the hearing officer found that Conteh's false and incorrect statements likely influenced the immigration tribunal's decision and were thus "prejudicial to the administration of justice" in violation of RPC 8.4(d). The hearing officer recommended a 60-day suspension.

¶19 With the exception of correcting a clerical error, the disciplinary board adopted the hearing officer's findings of fact. However, the board amended the conclusions of law to reflect that the record established a violation of count 2 as well as count 3 and increased the sanction recommendation to an 18-month suspension.

¶20 Conteh challenges several findings of fact, contests the conclusion of misconduct on counts 2 and 3, and disputes the recommended sanction.

## ANALYSIS

¶21 "This court bears the ultimate responsibility for lawyer discipline in Washington." *In re Disciplinary Proceeding Against Marshall*, 160 Wn.2d 317, 329, 157 P.3d 859 (2007). The bar association must prove misconduct by a "clear preponderance of the evidence." ELC 10.14(b). A hearing officer's unchallenged findings of fact are treated as verities on appeal. *In re Disciplinary Proceeding Against Marshall*, 167 Wn.2d 51, 66, 217 P.3d 291 (2009). We will uphold challenged findings of fact where they are supported by substantial evidence in the record, giving considerable deference to the hearing officer's assessment of credibility. *In re Disciplinary Proceeding Against Poole*, 156 Wn.2d 196, 208, 125 P.3d 954 (2006). "Substantial evidence" is evidence sufficient to convince a rational, fair-minded person. *Marshall*, 160 Wn.2d at 330. We review conclusions of law de novo and ensure they are supported by the findings of fact. *In re Disciplinary Proceeding Against Van Camp*, 171 Wn.2d 781, 797, 257 P.3d 599 (2011). Although we are not bound by the disciplinary board's recommended sanction, we recognize the board's " 'unique experience and perspective in the administration of sanctions' " and give its recommendation considerable weight. *In re Disciplinary Proceeding Against Dann*, 136 Wn.2d 67, 84, 960 P.2d 416 (1998) (quoting *In re Disciplinary Proceeding Against Noble*, 100 Wn.2d 88, 94, 667 P.2d 608 (1983)).

A. Factual Findings

¶22 As an initial matter, the bar association contends Conteh has procedurally forfeited his challenges to factual findings under RAP 10.3(g), which requires that "[a] separate assignment of error for each finding of fact a party contends was improperly made must be included with

reference to the finding by number." While Conteh's brief does not specify the contested factual findings under separate "assignments of error," his brief uses headings and separate paragraphs that clearly refer to each finding by number. Because Conteh's briefing makes his challenge clear, we waive any failure to strictly comply with the rule. *State v. Neeley*, 113 Wn. App. 100, 105, 52 P.3d 539 (2002) ("[I]n appropriate circumstances the appellate court will waive technical violations of the RAP where the briefing makes the nature of the challenge perfectly clear, particularly where the challenged finding can be found in the text of the brief." (citing *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 709-10, 592 P.2d 631 (1979); RAP 1.2(a))).

### 1. *Finding of Fact 11*

¶23 Conteh objects to the hearing officer's determination that he "disclosed only his employment with the government of The Gambia from July, 1999 through July, 2002" on his bar application. Decision Papers (DP) at 000002 (Findings of Fact (FF) 11). Conteh points to his hearing testimony that he worked for the government in a paid position through 2002 but was not terminated until December 17, 2007.

¶24 Conteh's testimony is irrelevant to what he disclosed in his bar application, which was admitted into evidence without objection. The application clearly states his employment with The Gambia ended in 2002. This finding is amply supported by the record.

### 2. *Finding of Fact 16*

¶25 Conteh objects to the hearing officer's finding that Conteh's practice of law (before being granted asylum) was "beyond the scope of his G2 status as it was not employment for or related to his duties for The Gambian government and, thus, was in violation of the United States immigration laws." DP at 000003 (FF 16).

¶26 Conteh objects, claiming he believed his I-94 form allowed him to practice as a lawyer and that he was not violating the immigration law.

¶27 To the extent this finding is one of fact, it will not be disturbed. No evidence suggests that Conteh's private practice of law was related to any official function for The Gambian government. Insofar as this finding involves questions of law, Conteh does not argue the hearing officer made an incorrect legal conclusion. Conteh's *belief* that he was not violating these laws does not impair the hearing officer's conclusion that he in fact did so. *See* 8 C.F.R. § 274a.12(b)(7) ("An alien in this [G-2] status may be employed only by the foreign government entity or the international organization.").

### 3. *Finding of Fact 25*

¶28 Conteh objects to this finding, which states that he "was not employed by the government of The Gambia in any usual sense of the word since July of 2002." DP at 000005 (FF 25). He points to the purported letter from his file, which stated he was terminated on December 17, 2007, and his testimony that he was on inactive status for his government. He claims this evidence was unrebutted.

¶29 But at the hearing, Conteh conceded that he had received no pay, claimed no benefits, and engaged in no official contact with The Gambian government since July 2002. On both his bar application and his I-140 form, he represented his employment with The Gambian government had ended in 2002. Thus, substantial evidence in the record supports the finding that Conteh was not employed "in any usual sense of the word" for The Gambian government since July 2002.

### 4. *Finding of Fact 26*

¶30 The hearing officer found that Conteh's failure to disclose his health care employment on his asylum application was material. This finding is adequately supported

by Dana Laverty's testimony that employment as a health care worker would have shown that he was out of status, possibly triggering greater scrutiny. It also bears noting that the hearing officer's finding that the omission was "material" was not necessary to finding a violation on count 3. DP at 000005 (FF 26).

### 5. *Finding of Fact 29*

¶31  Conteh objects to the hearing officer's finding that in July 2004, he attempted to change his status to avoid removal. Conteh claims this finding is inconsistent with his testimony that he tried to change his status to become a permanent resident because he knew his G-2 status was not permanent.

¶32  The hearing officer's finding is not inconsistent with Conteh's testimony and is supported by the record. Dana Laverty testified that Conteh was removable because he was out of status. He applied for lawful permanent residence status presumably because he wanted to continue to live and work in the United States—which he would be foreclosed from doing if he were deported. Thus, the hearing officer's finding that he applied for lawful permanent residence status to avoid removal is supported by substantial evidence.

## B. Conclusions of Law

### 1. *Count 2*

¶33  In count 2, Conteh was charged with violating RPC 8.4(i) and 8.4(k). RPC 8.4(i) provides that it is misconduct for a lawyer to "commit any act involving moral turpitude, or corruption, or any unjustified act . . . which reflects disregard for the rule of law." Under RPC 8.4(k), a lawyer commits misconduct by violating his oath as an attorney, under which the lawyer promises to abide by the laws of Washington and of the United States.

¶34  The hearing officer found that until Conteh was granted asylum, his private practice of law violated the

immigration laws of the United States. However, the hearing officer found no violation on count 2. As to the charge under RPC 8.4(i), the hearing officer found that working outside the scope of his G-2 status did not involve moral turpitude, corruption, or any act reflecting disregard for the rule of law. As to the charge under RPC 8.4(k), the hearing officer found there was no violation of the oath because that "portion of the oath . . . is prospective and already covered by RPC 8.4(i)." DP at 000006 (Conclusion of Law (CL) 2, ¶ 3).

¶35 Although the hearing officer found no violation on this count, the board concluded the record established a violation of Conteh's oath of attorney under RPC 8.4(k). Conteh claims the board erred in finding he knowingly violated his oath of attorney. We agree.

¶36 At the hearing, Conteh testified he did not believe his work as an attorney was unlawful. The hearing officer found that Conteh has never attempted to conceal his work as an attorney, and it is uncontested that he routinely represented immigration clients.

¶37 On this record, the hearing officer declined to find that Conteh knowingly violated the laws of the United States. This finding is entitled to deference, as the hearing officer was in the best position to assess the credibility of the testimony. *In re Disciplinary Proceeding Against Longacre*, 155 Wn.2d 723, 744, 122 P.3d 710 (2005). Because the record supports the hearing officer's finding, there is no basis for the board's contrary conclusion on count 2. Accordingly, we adopt the conclusion of the hearing officer and find no violation on count 2.[2]

---

[2] It is unnecessary to consider Conteh's argument that *In re Disciplinary Proceeding Against Curran*, 115 Wn.2d 747, 801 P.2d 962 (1990), allows attorney discipline to be imposed only when criminal laws are violated. Additionally, the bar association asks us to disaffirm *Curran* to the extent it holds that only violations of *criminal laws* are punishable as conduct showing disregard for the rule of law under RPC 8.4(i). Because the board found no violation of RPC 8.4(i), we decline to reconsider the limiting construction we gave RPC 8.4(i) in *Curran*.

### 2. *Count 3*

¶38 On count 3, the board held Conteh violated RPC 3.3(a)(1), 8.4(c), and 8.4(d) by misrepresenting his employment history on his application for asylum.

■ ¶39 RPC 3.3(a)(1) provides it is misconduct for a lawyer to "knowingly . . . make a false statement of fact or law to a tribunal." Conteh argues his conduct was merely negligent. Because the hearing officer is in the best position to determine a lawyer's state of mind, we give his findings "great weight." *Longacre*, 155 Wn.2d at 744. Here, the hearing officer found not only that Conteh's assertion of working for The Gambia through December 2007 was false but that Conteh knew it was false.[3]

¶40 Although Conteh argues he prepared his forms in the manner he believed appropriate, the hearing officer disbelieved him and found Conteh knowingly misrepresented his employment with The Gambia. The hearing officer's finding is supported by the testimony and exhibits. This testimony includes Conteh's admission that after July 2002 he received no payment from The Gambia. Furthermore, on his bar application and I-140 form Conteh certified—under penalty of perjury—that his employment with The Gambia ended in July 2002. Finally, Conteh testified that if his asylum application were filed within six months of the expiration of his lawful nonimmigrant status, he would have a circumstance meriting an exception to the rule that an application must be filed within one year of arrival. This testimony supports an inference Conteh may have been motivated to misrepresent his G-2 status as continuing through December 2007 so he could gain asylum.

---

[3] While the hearing officer's finding that the false statement was knowingly made appears in his "conclusions of law," it is a factual finding and will be reviewed as such. *State v. Ross*, 141 Wn.2d 304, 309, 4 P.3d 130 (2000) (noting a finding of fact that is mislabeled as a conclusion of law is reviewed as a finding of fact).

¶41 Next, the hearing officer found Conteh acted purposely to deceive and was therefore fraudulent under RPC 8.4(c). This finding and conclusion is supported by the same substantial evidence that supports the finding that Conteh's misrepresentation was knowingly false.

¶42 Finally, the hearing officer concluded Conteh's conduct was "prejudicial to the administration of justice" under RPC 8.4(d) because his statements "likely influenced the tribunal to reach a decision which it otherwise would not have made." DP at 000007 (CL 3, ¶ 7). " '[C]onduct deemed prejudicial to the administration of justice has generally been conduct of an attorney *in his official or advocatory role* or conduct which might physically interfere with enforcing the law.' " *In re Disciplinary Proceeding Against Kuvara*, 149 Wn.2d 237, 255, 66 P.3d 1057 (2003) (alteration in original) (quoting *In re Disciplinary Proceeding Against Curran*, 115 Wn.2d 747, 764, 801 P.2d 962 (1990)). Accordingly, we sustain the board's conclusion that Conteh committed misconduct on count 3.

C. Recommended Sanction

¶43 The hearing officer recommended a 60-day suspension. After finding an additional violation, the board unanimously recommended an 18-month suspension. While this court retains ultimate responsibility for imposing attorney discipline, we generally defer to the board's expertise and affirm its sanction recommendation unless we can " 'articulate a specific reason to reject the recommendation.' " *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 59, 93 P.3d 166 (2004) (quoting *In re Disciplinary Proceeding Against McLeod*, 104 Wn.2d 859, 865, 711 P.2d 310 (1985)). Here, we have good reason to depart from the board's recommendation. Because we reject the board's conclusion that Conteh violated his oath of attorney, we reject its proposed 18-month suspension. Instead, we will determine the appropriate sanction based on Conteh's proven misconduct, giving due deference to the hearing officer's findings.

¶44 Appropriate disciplinary sanctions are determined by reference to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992). *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 492, 998 P.2d 833 (2000), *abrogated on other grounds by In re Disciplinary Proceeding Against Anschell*, 149 Wn.2d 484, 69 P.3d 844 (2003). This involves a two-step process: first, the presumptive sanction is determined by considering (1) the ethical duty violated, (2) the lawyer's mental state, and (3) the extent of actual or potential injury. *Kuvara*, 149 Wn.2d at 252. Second, aggravating and mitigating circumstances are considered to evaluate whether a departure from the presumptive sanction is warranted. *Id.* When raised by the attorney, this court additionally considers the proportionality of the sanction and the degree of unanimity among the board members. *In re Disciplinary Proceeding Against Ferguson*, 170 Wn.2d 916, 940 n.7, 246 P.3d 1236 (2011).

### 1. *Presumptive Sanction*

¶45 The record establishes Conteh's misconduct alleged in count 3. On this count, the board applied standard 6.1, which applies to "conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit or misrepresentation to a court." Under standard 6.12, suspension is appropriate when the lawyer knows false statements are being submitted to a court and causes a potentially adverse effect on the legal proceeding. Conteh argues his conduct was merely negligent; for the reasons discussed earlier, substantial evidence supports the determination that Conteh knew his statements were false. Accordingly, suspension is the presumptive sanction.

### 2. *Aggravating and Mitigating Factors*

¶46 The hearing officer considered three aggravating circumstances: (1) prior misconduct in the form of negligent misrepresentation on behalf of a client resulting in a

reprimand, (2) selfish motive, and (3) refusal to acknowledge the wrongful nature of his conduct. Conteh contests two of these aggravators: the presence of a selfish motive and the finding that he refused to acknowledge the wrongful nature of his conduct. Both are supported by substantial evidence.

¶47 The hearing officer's finding that Conteh acted with a selfish motive is supported by his finding that without the misrepresentation of continuing The Gambian employment, Conteh's asylum application would have been denied.

¶48 As for failure to acknowledge the wrongful nature of conduct, we have explained that this factor "applies to an attorney who admits he engaged in the alleged conduct" but "denies the conduct was wrongful or who 'rationalize[s] improper conduct as an error.'" *Ferguson*, 170 Wn.2d at 943-44 (alteration in original) (quoting *In re Disciplinary Proceeding Against Holcolmb*, 162 Wn.2d 563, 588, 173 P.3d 898 (2007)). Here, Conteh rationalizes having stated he was employed by The Gambia through 2007 with the explanation that he was on inactive status for five years—despite having previously represented on his bar application and I-140 form that his employment ended in July 2002. This aggravating factor is amply supported by the record.

¶49 The hearing officer also applied two mitigating factors: cooperative attitude toward disciplinary proceedings and significant pro bono work.

¶50 The board accorded the factor of cooperative attitude little weight because his cooperation did not go beyond that required. Conteh urges us to give this factor great weight. We place the burden on the attorney to establish that his "'disclosure or cooperation *surpassed* what is required from all attorneys.'" *In re Disciplinary Proceeding Against Preszler*, 169 Wn.2d 1, 32, 232 P.3d 1118 (2010) (quoting *In re Disciplinary Proceeding Against Trejo*, 163 Wn.2d 701, 733, 185 P.3d 1160 (2008)). Even with this showing, cooperation "'is not a particularly significant

mitigating factor in determining an appropriate sanction.' " *Id.* (quoting *In re Disciplinary Proceeding Against Johnson*, 114 Wn.2d 737, 747, 790 P.2d 1227 (1990)). Here, Conteh claims he furnished confidential information in the course of these proceedings. But as the bar association notes, Conteh was required to provide a written release to obtain otherwise confidential documents from USCIS under ELC 5.3(e)(4). Therefore, we accord this factor little weight.

¶51 The bar association asks us to strike the mitigating factor of significant pro bono work because there was no testimony to support this finding. The only reference to pro bono work in the record was in exhibit 16, in which Conteh discussed his pro bono work in a letter to the acting director of the Department of Homeland Security, noting that he received commendation from the bar association for completing 50 hours of pro bono service in 2005. While this letter would constitute hearsay in a criminal or civil proceeding, disciplinary proceedings are "sui generis hearings" to which hearsay rules do not apply. ELC 10.14. Because there is evidence supporting this factor, we decline the invitation to strike it.

¶52 Conteh asks us to find the mitigating factor of remorse. While Conteh expressed some remorse at the hearing, the full course of his conduct may be considered. The hearing officer did not find sufficient facts to support this factor, and we will not supplant his judgment, which is amply supported by the record.

¶53 In conclusion, the aggravating factors outweigh the mitigating factors, but not so substantially as to alter the presumptive sanction of suspension.

### 3. *Proportionality*

¶54 We compare the facts underlying Conteh's misconduct with the facts from similar discipline cases to ensure consistent and proportionate sanctions. *In re Disciplinary Proceeding Against Blanchard*, 158 Wn.2d 317, 334, 144 P.3d 286 (2006). When evaluating the proportionality of

the sanction, we focus on the misconduct found, the presence of aggravating factors, the existence of prior discipline, and the lawyer's culpability. *Van Camp*, 171 Wn.2d at 816.

¶55 Conteh points to *Ferguson*, 170 Wn.2d 916, as supporting a lenient sanction in his case. In *Ferguson*, the attorney "appeared ex parte before a superior court judge in a contested matter without notice to opposing counsel, failed to disclose all relevant facts at an ex parte hearing, and obtained relief through misrepresentation and deceit." *Id.* at 921. Importantly, the court in *Ferguson* found the attorney's conduct merely negligent. *Id.* at 937. Moreover, it was an isolated incident and she had no prior disciplinary history. *Id.* at 941. Here, Conteh acted knowingly and with intent to deceive and he has prior discipline involving negligent misrepresentations to a tribunal. Thus, his sanction should be harsher than the 90-day suspension imposed in *Ferguson* because Conteh's misconduct was more egregious than Ferguson's.

¶56 We find Conteh's misconduct similar to that committed by the attorney in *In re Disciplinary Proceeding Against Dynan*, 152 Wn.2d 601, 98 P.3d 444 (2004). The attorney in *Dynan* knowingly altered billing records to reflect a higher hourly rate than he actually charged and submitted false declarations to the court in support of his motions for attorney fees. *Id.* at 607, 625. Dynan's aggravating factors slightly outweighed the mitigating factors. *Id.* at 622. We considered Dynan's lack of a disciplinary record and the lack of a selfish or dishonest motive in departing from the presumptive sanction of disbarment and imposing a six-month suspension. *Id.* at 620, 625.

¶57 While Dynan's misconduct was somewhat worse than Conteh's, Conteh has a prior disciplinary record and his aggravating factors more substantially outweigh his mitigating factors. Consistency considerations suggest Conteh's sanction should be similar to Dynan's.

¶58 In considering the appropriate length of suspension, we begin with a period of six months, which has

been described as "the presumptive starting point when suspending an attorney." *In re Disciplinary Proceeding Against Cohen*, 149 Wn.2d 323, 339, 67 P.3d 1086 (2003). Here, we believe a suspension of six months reflects the seriousness of Conteh's misconduct, respects the balance of aggravating and mitigating factors, and is proportionate to sanctions imposed in similar cases.

## CONCLUSION

¶59 We find the board properly adopted the hearing officer's findings but erred in finding a violation on count 2. Based on Conteh's misconduct as charged on count 3, we impose a six-month suspension.

MADSEN, C.J., and C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, WIGGINS, and GONZÁLEZ, JJ., concur.